IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19–cv–03665–PAB–KMT

ROSE A. HOLLOWAY,

    Plaintiff,

v.

FREMONT COUNTY RE-1, CANON CITY HIGH SCHOOL,

    Defendant.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Kathleen M. Tafoya**

    This case comes before the court on "Defendant's Motion for Summary Judgment" (Doc. No. 66 [Mot.], filed April 20, 2021), to which Plaintiff responded in opposition (Doc. No. 68 [Resp.], filed May 10, 2021), and Defendant replied (Doc. No. 69 [Reply], filed May 21, 2021).

### UNDIPSUTED FACTS[1]

    1.    Defendant Fremont County RE-1 is a public school district serving approximately three thousand five hundred students from early childhood through twelfth grade and has approximately five hundred employees. The School District has a specific policy committed to

---

[1] Plaintiff has failed to comply with Chief District Judge Brimmer's Practice Standards (Civil Cases), which require a party opposing a motion for summary judgment to, "in a section of the brief required by Rule 56.1(a) of the United States District Court for the District of Colorado Local Rules of Practice (Civil) styled 'Response to Statement of Undisputed Material Facts,' admit or deny the asserted material facts set forth by the movant" and to accompany any denial with "a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial." *See* Section III.F. of Practice Standards (Civil Cases) of Chief Judge Philip A. Brimmer.

providing a workplace free from discrimination of any kind, including discrimination based on race/national origin.  (Mor., Ex. A, Aff. of George Welsh, ¶¶ 3–4; School District Policy AC-E-1.)[2]

2. On June 15, 2018, Plaintiff submitted her Cañon City School Online Application for various positions at the School District, including as a Special Education position at Cañon City High School ("CCHS").  (Mot., Ex. B, Pl.'s Dep. at 29:22–30:7; 30:20–31:1; Ex. C at 2, Pl.'s Application with the School District; Ex. D, ¶¶ 3–4, Aff. of Jamie Davis.)

3. The School District's online employment application did not request Plaintiff to identify her race/national origin.  (Mot., Ex. B at 31:2–24; Ex. D at ¶¶ 3–4; *see generally*, Ex. C.)

4. On June 20, 2018, School District employees Bill Summers, the principal at CCHS, and two other principals interviewed Plaintiff for the positions she sought.  (Mot., Ex. B at 28:3–24; Ex. D, ¶ 4; Ex. E at 2, June 21, 2018 Cañon City Schools Employment Recommendation/Change Form.)

5. On June 21, 2018, at approximately 8:30 AM, the School District's Human Resources Department prepared and sent Plaintiff's online application and attachments to Principal Summers.  (Mot., Ex. C at 1; Ex. D, ¶ 4.)

6. Nowhere within Plaintiff's application materials forwarded to Principal Summers does it indicate Plaintiff's race/national origin as Hispanic.  (*See generally*, Mot., Ex. C; *see also* Ex. B at 32:19–23; Ex. D, ¶¶ 4–5.)

---

[2] *See* School District Policy AC-E-1 available at: https://www.canoncityschools.org/board-of-education/board-policies.

7. On June 21, 2018, Principal Summers recommended that the School District offer Plaintiff the position she sought as a Special Education teacher at CCHS. (Mot., Ex. D, ¶ 4; Ex. E at 1–2; Ex. B at 25:12–26:5.)

8. On June 25, 2018, the School District, by and through its Board of Education ("School Board"), formally offered Plaintiff the CCHS Special Education Teacher position she sought and provided Plaintiff with a one-year Licensed Teacher Contract for the period of August 13, 2018, through May 24, 2019. (Mot., Ex. F, Offer Letter and Contract.) On July 18, 2018, Plaintiff accepted her one-year appointment by executing the contract. (*Id.*)

9. At CCHS, Plaintiff acted as an Individual Education Plan ("IEP") Manager for students on her caseload. Her CCHS supervisors were Siena Wamsganz, CCHS's Case Manager, and CCHS Principal Summers. (Mot., Ex. B at 29:4–16.)

10. Shortly after the school year began, on August 27, 2018, Ms. Wamsganz notified Tim Renn, the School District's Director of Special Services, of a concern that parents of two students in Plaintiff's CARE class withdrew after the "one day they spent in there made them feel like a preschooler." Ms. Wamsganz notified Mr. Renn that "perhaps Rose missed the mark in relating the course content and purpose of the class when she introduced it to her students." (Mot., Ex. G at ¶¶ 3–5, Aff. of Shaun Kohl; Ex. H, Wamsganz Aug. 27, 2018 email to Tim Renn.)

11. On September 7, 2018, Principal Summers provided Plaintiff with an observation of her CARE class. Therein, Mr. Summers noted that: (a) Ms. Holloway failed to post a daily target of "Who will do what, how?;" (b) that "three students [were] totally disengaged; one causing a distraction to the rest of the class;" and (c) a concern that Ms. Holloway was not

3

engaging the single female student in her class. (Mot., Ex. G, ¶¶ 3–5; Ex. I, Summers' Sept. 7, 2018 Observation of Plaintiff; Ex. J, ¶¶ 3; 6, Aff. of Bill Summers.)

12. At or near the first two months of the 2017–2018 school year, Plaintiff suspects that her race and national origin were made known to the CCHS administration because "if [she] mentioned [her] ethnicity" a co-teacher, Mrs. Schott with whom Plaintiff shared a classroom, may have overheard Plaintiff tell a student that she identified as Hispanic. (Mot., Ex. B at 34:14–36:7.) Ms. Schott never discussed Plaintiff's race or national origin with Plaintiff, and Plaintiff never witnessed Ms. Schott mentioning Plaintiff's Hispanic ethnicity to anyone at the School District including but not limited to Principal Summers. (*Id.* at 36:8–37:1; 46:11–17)

13. There are no documents whatsoever demonstrating that Plaintiff's race and nationality was confirmed by Principal Bill Summers and/or the CCHS administration in October 2018. (Mot., Ex. B at 52:18–23.)

14. No individuals at the School District ever asked Plaintiff about her race or national origin. (Ex. B at 32:8–15.)

15. On September 25, 2018, a CCHS school counselor, Stacy Andrews, informed Plaintiff that her students were complaining about the "frustration with the pace of [her] class" and that the "amount/number of blogs in such a short period of time is overwhelming." (Not., Ex. G, ¶¶ 3–5; Ex. K, Andrews' Sept. 25, 2018 email to Plaintiff.) Plaintiff responded by stating her belief that her assignments were not overwhelming and replying, "I know what I am doing." (*Id.*)

16. On October 3, 2018, Ms. Wamsganz forwarded Principal Summers a list of concerns regarding Ms. Holloway including: (a) her first IEP for one of her students being "filled

with mistakes and information that would put it out of compliance" with the Colorado Department of Education; (b) the tardiness of her draft IEP submittal; (c) her refusal to accept feedback and/or recommended changes; and (d) the need to provide Ms. Holloway "comprehensive training" despite having been previously afforded prior "transition expectations" training from other CCHS staff members. (Mot., Ex. G, ¶¶ 3–5; Ex. L, Wamsganz's Oct. 2, 2018 email to Principal Summers.)

17. On October 9, 2018, three months after Principal Summers interviewed and offered Plaintiff her position at CCHS and less than two months into the 2017–2018 school year, Principal Summers placed Plaintiff on a Performance Improvement Plan ("PIP"). (Mot., Ex. J, ¶¶ 7; Ex. M, Plaintiff's Oct. 9, 2018 Performance Improvement Plan.) Plaintiff's PIP listed and described four areas of concern including: (a) IEP accomplishment and staffing fulfillment; (b) assessment and assignment diversity, appropriateness, and frequency; (c) workplace relationships; and (d) classroom management. (Mot., Ex. J, ¶ 7; Ex. M at pp. 1–2.) Due to these areas of concern, Plaintiff's PIP numerically listed specific improvement goals (*i.e.*, Nos. 1–11) and a mandatory timeline for their completion. (Ex. J, ¶ 7; Ex. M at pp. 3–4.) This timeline required Plaintiff to comply with: Improvement Goal No. 1 no later than November 2, 2018; Improvement Goals Nos. 2–10 no later than December 20, 2018; and Improvement Goal No. 11 no later than Jan. 31, 2019. (Ex. M at 4). The PIP also stated:

> Effective immediately, you are placed on a PIP through the end of February 2019. During this time, you are expected to make regular progress on the plan outlined above. If there is no significant improvement to indicate that the expectations and goals will be met within the timeline indicated in this PIP, you may receive an evaluation rating below "Effective" at the mid-term evaluation cycle milestone. Finally, failure to meet these standards or regression beyond the midterm evaluation cycle milestone can result in a final evaluation rating below

>"Effective." According to the Colorado Department of Education process, and as you are on probationary status, you may be non-renewed."

(*Id.*) On this date, Plaintiff met and reviewed her PIP with Principal Summers, received a copy of it, and acknowledged receipt via her signature. (*Id.* at 5; Ex. B at 65:15–67:12.)

18. On December 19, 2018, Principal Summers again observed Ms. Holloway's class and had "some concerns." These included: (a) a failure to present a daily target to answer the question "Who will do what, how;" (b) her students' low level of engagement, i.e. ritual compliance (low attention + low commitment); (c) that her students did not know the purpose of the classroom video presented and there was no discussion or assignment of it thereafter; (d) a lack of equal access and consistency amongst a co-taught classroom environment; and (e) a concern for Plaintiff's respect and fairness towards her students as she described one half of the classroom as "good" while the other half "was 'lazy, complaining, and bad.'" (Mot., Ex. J at ¶ 8; Ex. N, Summers' Dec. 19, 2018 Observation of Plaintiff.)

19. On December 20, 2018, Principal Summers met with Plaintiff and evaluated her PIP progress. (Mot., Ex. J, ¶ 9; Ex. O, Plaintiff's Dec. 20, 2018 PIP.) At this meeting, Plaintiff was informed that she had not met in full Improvement Goals Nos. 2, 3, 4, 9, and 10, contrary to the progress mandated by that date. (Ex. J, ¶ 9; Ex. O at 3–4; 6). Plaintiff was also provided detailed feedback substantiating the reasons why Principal Summers did not believe she met those goals. (Ex. O at 3–4.) On this date, Plaintiff reviewed her updated PIP with Principal Summers, received a copy of it, and acknowledged receipt via her signature. (*Id.* at 5; Ex. J at ¶ 9.)

20. On January 30, 2019, Principal Summers and CCHS Assistant Principal Michelle Johnson met with Plaintiff to conduct her mid-year review where they also provided Plaintiff

with updated PIP detailing her progress to date.  (Mot., Ex. J, ¶ 11; Ex. P, Plaintiff's Jan. 30, 2019 PIP; Ex. Q, ¶ 4, Aff. of Michelle Johnson; Ex. R, Johnson's Notes of Jan. 30, 2019 Meeting with Plaintiff.)  At this meeting, Plaintiff was again informed that she had not met Improvement Goals Nos. 2, 3, 4, 9, and 10, contrary to the improvements expected prior to that date.  (Ex. J, ¶ 11; Ex. Q, ¶ 4; Ex. P at 3–5.)  She was also provided detailed feedback substantiating the reasons why Principal Summers did not believe she met those goals.  (Ex. P at 3–5.)  On this date, Plaintiff reviewed her updated PIP with Principal Summers, received a copy of it, and acknowledged receipt via her signature.  (*Id.* at 6; Ex. J, ¶ 11; Ex. Q, ¶ 4.)

21. Pursuant to Section 8–4 of the Master Agreement between the School District and the Cañon City Education Association, at their January 30, 2019 meeting, Principal Summers provided Plaintiff a copy of his written recommendation to non-renew her contract for the 2019–2020 school year.  (Mot., Ex. J, ¶¶ 12; Ex. S, Summers' Intent to Non-Renew Letter; Ex. T at 16, Master Agreement between School District and Cañon City Education Association; Ex. Q, ¶ 4; *see also* Ex. R at 1.)

22. Also at the January 30, 2019 mid-year evaluation meeting, Principal Summers suggested that Plaintiff consider submitting her resignation instead of being non-renewed as he could not serve as Plaintiff's reference should she be subject to the latter.  Principal Summers requested that Plaintiff provide her resignation, if she chose to do so, by February 15, 2019.  (Mot., Ex. J, ¶ 12; Ex. R at 1–2; Ex. Q, ¶ 4.)  After this meeting, Principal Summers sent Plaintiff's PIP packet and his recommendation for non-renewal to the School District's Director of Human Resources Misty Manchester.  (Ex. J, ¶ 13; Ex. P at 6.)

23. At no time during the above-mentioned evaluation process and meetings did Ms. Holloway ever express a belief that she was being discriminated against on the basis of her race/national origin. (Mot., Ex. J, ¶¶ 14; Ex. Q at ¶ 5.)

24. At no time during the above-mentioned evaluation process and meetings did Principal Summers ever learn that Plaintiff identified herself as Hispanic. (Ex. J, ¶ 14; Ex. Q, ¶ 5.)

25. On February 15, 2019, Principal Summers and Assistant Principal Johnson again met with Plaintiff to discuss her non-renewal or potential resignation. (Mot., Ex. J, ¶ 15; Ex. Q, ¶ 7; Ex. U, Johnson's Notes of Feb. 15, 2019 Meeting with Plaintiff.) At Plaintiff's request, Principal Summers extended the period that he would accept a letter of resignation to February 20, 2019, and he explained to Plaintiff that should she do so she could serve out the remainder of her annual contract with full pay and benefits even if she did "not come to work." Should she decide not to resign, Principal Summers again informed Plaintiff that he would recommend the non-renewal of her contract at the end of the 2018–2019 school year, and he could not serve as a reference. (Ex. J, ¶¶ 15; Ex. V, Summers' Feb. 15, 2019 letter to Plaintiff; Ex. Q, ¶ 7; Ex. U.)

26. On February 20, 2019, Plaintiff requested and received a one-day extension from Principal Summers to submit her letter of resignation. (Mot., Ex. G, ¶¶ 3–5; Ex. W, Feb. 20, 2019 email between Plaintiff and Principal Summers.)

27. On February 21, 2019, Plaintiff briefly met with Principal Summers to provide her letter of resignation. (Mot., Ex. J, ¶ 17; Ex. X, Plaintiff's Feb. 21, 2019 Resignation Letter; Ex. G, ¶¶ 3–5; Ex. Y, Plaintiff's Feb. 21, 2019 email to Siena Wamsganz). Plaintiff's resignation letter was then forwarded to the District's Director of Human Resources Misty

Manchester and Superintendent George Welsh for School District approval that same day. (Ex. J, ¶ 17; Ex. X.) Therein, Plaintiff's resignation letter blamed Principal Summers for making her feel like an "unsafe target at CCHS" in which she allegedly could not "continue without worrying for my safety." Plaintiff also claimed that Principal Summers was "bias[ed]" against her. (*Id.*). Plaintiff's resignation letter makes no mention of any unlawful discrimination whatsoever including but not limited to discrimination based on Plaintiff's race/national origin. (Ex. X; *see also* Ex. J at 17; Ex. A, ¶ 9.)

      28.      The next day, on February 22, 2019, Principal Summers and Assistant Principal Johnson met Plaintiff in her classroom and informed her that the District would not accept her letter of resignation; she was being placed on immediate administrative leave for the rest of the school year; and Superintendent Walsh intended to submit his non-renewal recommendation to the District's Board of Education for approval. (Mot., Ex. J, ¶ 19; Ex. Q, ¶ 9; *see also* Ex. A at ¶ 9; Ex. Z, Superintendent Welsh's Feb. 22, 2019 email to District employees.) Principal Summers then requested that Plaintiff remove her personnel belongings from CCHS and return her CCHS keys and badge. (Ex. J, ¶ 19; Ex, Q, ¶ 9.) Due to the amount of Plaintiff's personal belongings in her classroom (including furniture), Principal Summers and Assistant Principal Johnson asked Plaintiff if she needed help packing/moving her belongings. Plaintiff stated that she did, and both Principal Summers and Assistant Principal Johnson assisted Plaintiff by bringing her belongings to her car. At no time did Principal Summers or Assistant Principal Johnson force or march Plaintiff out of the building. (*Id.*) At this time, Plaintiff did not mention a belief that she was being discriminated against due to her race/national origin. (Ex. J, ¶ 20; Ex. Q, ¶ 10.)

29. Later that day, on February 22, 2019, Plaintiff requested and met with School District Superintendent George Walsh and Director of Human Resources Misty Manchester regarding her non-renewal. (Mot., Ex. B at 48:13–49:15; 50:7–21; Ex. AA at 3:14–4:13, Transcript of Recorded Meeting between Rose Holloway, George Welsh, and Misty Manchester, Ex. A, ¶ 10; Ex. BB, Manchester's Feb. 22, 2019 Letter to Plaintiff.)

30. At this meeting, Superintendent Welsh explained why he decided not to accept Plaintiff's resignation letter. (Mot., Ex. AA at 10:21–12:16; *see also* Ex. A, ¶ 10.) Superintendent Welsh and Ms. Manchester also confirmed that Plaintiff was being placed on paid administrative leave for the rest of the school year, and she would continue to receive full pay and benefits through the end of her contract term. (Ex. AA at 8:13–10:12; 21:12–22:4; Ex. BB.) Plaintiff was also informed that her contract non-renewal would be placed before the District's Board of Education for approval on February 25, 2016. (Ex. AA at 21:12–14; Ex. BB.)

31. During her meeting with Superintendent Welsh and Ms. Manchester, Plaintiff did not mention a belief that she was being discriminated against based on her race/national origin. (*See generally*, Ex. AA.)

32. On February 25, 2019, the District's Board of Education voted to non-renew Plaintiff's contract for the 2019–2020 school year. (Ex. D, ¶¶ 3–4; Ex. CC, Manchester's Feb. 26, 2019 Letter to Plaintiff.)

33. Prior to receiving and reviewing a copy of Plaintiff's underlying Equal Employment Office Commission ("EEOC") Charge of Discrimination alleging race/national origin discrimination and retaliation, neither Principal Summers nor Superintendent Welsh knew

10

that Plaintiff identified herself as Hispanic. (Mot., Ex. J, ¶¶ 14; 16–17; 20–21, Ex. A, ¶¶ 8–9; 12; *see also* Ex. D, ¶¶ 5–7.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. Moreover, because

Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

Title VII prohibits an employer from engaging in certain behavior, including discriminating against any individual "because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000(e)–2(a). Title VII also forbids an employer from retaliating against an individual because the individual "has opposed any practice made an unlawful employment practice" by Title VII, 42 U.S.C. § 2000(e)–3(a) (retaliation). A plaintiff may prove discrimination and retaliation by either direct or circumstantial evidence. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008); *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004). Direct evidence demonstrates on its face that employment termination was either discriminatory or retaliatory. *Adamson*, 514 F.3d at 1145. In contrast, circumstantial evidence permits the fact finder to draw a reasonable

inference from facts indirectly related to discrimination or retaliation that discrimination or retaliation has, in fact, occurred. *Anderson*, 122 F. App'x at 916.

Plaintiff does not provide direct evidence of discrimination or retaliation, and the court's review of the record reveals none. Accordingly, Plaintiff's Title VII claims are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation. *Id*. If the plaintiff meets this initial burden, the defendant must then offer a legitimate, non-discriminatory reason for its employment action. *Id.* If the defendant offers a legitimate, non-discriminatory reason for its employment action, the plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual. *Id.*

### *A.     Discrimination*

To make a prima facie case of discrimination under Title VII, a plaintiff must establish "that (1) she belongs to some protected class, (2) she was qualified for the position or benefit at issue, (3) she suffered an adverse employment action, and (4) she was treated less favorably than others . . . ." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006) (quoting *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004)).

Plaintiff has submitted no evidence that either Principal Summers or Superintendent Welsh ever knew that Ms. Holloway was Hispanic, and they both deny ever knowing this information prior to deciding to submit Ms. Holloway's non-renewal for the School Board's approval. (Undisputed Fact Nos. 23–24; 27–28; 31; 33.) It is undisputed that Plaintiff's online application with the School District did not request her to identify her race/national origin.

(Undisputed Fact No. 3.)  Plaintiff also admits that her School District application materials and its attachments forwarded to Principal Summers did not indicate or identify her as Hispanic. (Undisputed Fact No. 6; Mot., Ex. B at 32:19–23.)  After reviewing her own personnel file with the School District, Plaintiff admits that it does not indicate or identify her as Hispanic; therefore, "Mr. Summers could not have known I was Hispanic [i]f that is all that's in there." (Ex. B at 34:10–12; *see also* Ex. D, ¶¶ 3–4; Ex. DD, Plaintiff's personnel file with the School District.)

Instead, Plaintiff submits pure speculation that her Hispanic race/national origin was known to the Principal Summers and Superintendent Welsh sometime within the first two months of the 2017–2018 school year because "if she mentioned [her] ethnicity" to a co-teacher with whom Plaintiff shared a classroom (i.e. Ms. Schott), that person *may* have overheard her mention that she was Hispanic to a student.  (Undisputed Fact No. 12.)  However, Ms. Holloway admits that she never witnessed Ms. Schott discuss her race/national origin with her or others. (*Id.*)  Plaintiff also admits that she: (a) has no documents demonstrating that her race/national origin was confirmed by or made known to her CCHS administration and (b) no individuals at the School District ever asked her about her race or national origin.  (Undisputed Fact Nos. 13–14).  As speculation, conjecture, and surmise are insufficient to establish a genuine issue of material fact, summary judgment is warranted for Plaintiff's First Claim for Relief as she cannot establish that the relevant decisionmakers knew of her protected class status prior to deciding to non-renew her contract.  *Bones*, 366 F.3d at 875; *Belcher*, 105 F. App'x at 226.

Plaintiff has not shown that there is a factual dispute as to whether Defendant knew Plaintiff was a member of a protected class.  As such, Plaintiff cannot establish a prima facie

case for discrimination. *See Owens v. Donahoe*, 913 F. Supp. 2d 1055, 1062 (D. Colo. 2012) (summary judgment granted in favor of the defendants where the plaintiff did not show the defendants knew plaintiff was African American). Defendant should be granted summary judgment on Plaintiff's discrimination claim.

### B.   *Retaliation*

Title VII's anti-retaliation provision forbids an employer from discriminating against an individual because that individual "has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation under *McDonnell Douglas*, a plaintiff must demonstrate (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Argo*, 452 F.3d at 1202. However, "a vague reference to discrimination . . . without any indication that this misconduct was motivated by race (or any other category protected by Title VII) does not constitute protected activity and will not support a retaliation claim." *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004) (citing *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002)).

In her Complaint, Plaintiff alleges that upon receipt of Plaintiff's letter of resignation, "

> the Administration retaliated because of the charge of bias/discrimination cited in the Letter of Resignation. The defendant did this by refusing to accept the Letter of Resignation, and instead decided to terminate employment, confiscated keys and badges from the Plaintiff, loaded most of the Plaintiff['s] property onto carts, and humiliated the Plaintiff by force marching the Plaintiff out of the building, stuffing the Plaintiff['s] property into the Plaintiff['s] car, and locking the Plaintiff out of the Building.

(Doc. No. 1 [Compl], ¶ 15.) Plaintiff's resignation letter contains only a vague allegation of Principal Summers' "bias" against her, and it specifically does not mention any race/nationality discrimination or any other unlawful employment practice under Title VII. (Undisputed Fact No. 27; Mot., Ex. X.) Finally, Principal Summers and Superintendent Welsh both deny (a) perceiving that Ms. Holloway's resignation letter as stating any unlawful discrimination against her or (b) ever hearing Ms. Holloway claim she was being unlawfully discriminated against on the basis of her race/national origin. (Undisputed Fact Nos. 23; 27–28; 31; *see also* Ex. A, ¶¶ 9; 12; Ex. J, ¶¶ 14; 16; 17; 20–21.)

Plaintiff's resignation letter is not protected activity that can support her retaliation claim. *Anderson*, 122 F. App'x at 916. Accordingly, Defendant should be granted summary judgment on Plaintiff's retaliation claim.

**WHEREFORE**, for the foregoing reasons, this court respectfully

**RECOMMENDS** that "Defendant's Motion for Summary Judgment" (Doc. No. 66) be **GRANTED**.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for de novo review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely

and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar de novo review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579–80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation de novo despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).

Dated this 26th day of January, 2022.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge